214 N.J. Super. 51 (1986)
518 A.2d 486
DANIEL JANSEN, PLAINTIFF-APPELLANT,
v.
FOOD CIRCUS SUPERMARKETS, INC., DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1986.
Decided November 20, 1986.
*52 Before Judges O'BRIEN, SKILLMAN and LANDAU.
Stephen B. Hunter argued the cause for appellant (Klausner & Hunter, attorneys; Stephen B. Hunter, of counsel and on the brief).
Gary E. Fox argued the cause for respondent (Abramoff, Fox, Zaro & McGovern, attorneys; Gary E. Fox, of counsel; Patricia F. Stefanile, on the brief).
Lynn B. Norcia, Deputy Attorney General, argued the cause for Division on Civil Rights as amicus curiae, W. Cary Edwards, Attorney General of New Jersey, attorney; Andrea M. Silkowitz, Deputy Attorney General, of counsel; Susan L. Reisner, Deputy Attorney General, on the brief).
Linda D. Headley, Assistant Deputy Public Advocate, filed a brief for Epilepsy Foundation of New Jersey as amicus curiae *53 (Alfred A. Slocum, Public Advocate of New Jersey, attorney; Linda D. Headley, of counsel).
Louis Bucceri filed a brief for Epilepsy Foundation of America as amicus curiae (Bucceri & Pincus, attorneys).
The opinion of the court was delivered by O'BRIEN, J.A.D.
Plaintiff Daniel Jansen (Jansen) appeals from a judgment of the Chancery Division in favor of his former employer, Food Circus Supermarkets, Inc. (Food Circus), concluding that the employer had not discriminated against Jansen in terminating his employment as prohibited by N.J.S.A. 10:5-4.1. We affirm.
There is no dispute that Jansen suffers from a seizure disorder of the temporal lobe or psychomotor type, also referred to as partial complex seizures. This is a form of epilepsy, a handicap specifically included within the definition of "handicapped" in N.J.S.A. 10:5-5q. Jansen had been employed by Food Circus as a meat cutter for approximately eight years prior to his suspension and termination. He had the seizure disorder during the entire period of his employment. The trial judge found:
There were no incidents of psychomotor seizures at work.[1] The employer was aware of the hospitalizations and the epileptic etiology of them and raised no question as to his continuing employability. [Footnote supplied.]
*54 On Saturday, July 17, 1982, while Jansen was being instructed as to how to cut top-round steaks, he suffered a seizure which the trial judge described:
Suddenly, Jansen simply stopped what he was doing with a completely blank look. He simply stood there with the knife in his right hand staring at Iannuzzi. He did not respond to Iannuzzi's inquiries as to what was the matter. After a short time Iannuzzi reached for the knife and removed it from his hand. Jansen then sat on the block. He seemed to recover somewhat; noticed another co-employee who had entered the cutting room at that moment; said to him `this is it, it's all over'; got up and walked out of the room.
Jansen was sent home from work and instructed to get a doctor's note before returning. Shortly thereafter, Jansen went to the home of a fellow employee, John Snel, and indicated in a rude manner that Snel should not tell Food Circus managers what he knew about Jansen's condition. On the following Wednesday, July 21, 1982, Jansen returned to work with a note from Dr. Silbert, observing that Jansen's seizures "have been under fair control on medication" and that he expected "to be able to achieve better seizure control." Jansen worked on Wednesday and Thursday, July 21 and 22. On July 23, Snel reported an incident to his superior, which he considered to be a threat made by Jansen. According to Snel, the incident occurred on Thursday, July 22, when
He [Jansen] explained to me well I guess this is it, I guess I am going to lose my job. But he said I think I am going to go trapping in Oregon. But before I go I am going to take six people with me. While he sat there he sat there with an open hand and a clenched fist and hitting his hand over and over again.
As a result of the report, Jansen was suspended from his employment, apparently without pay.[2] The suspension was followed by a letter from a company vice-president to Jansen, advising that he was suspended effective July 23, 1982, "pending examination by doctors of our choosing to determine your competency, from a medical standpoint, to return to work." *55 Thereafter, Jansen was evaluated by Dr. Gerald F. Whalen, a neurosurgeon, and Dr. Hector Corral, a psychiatrist. Based upon the medical reports of these two doctors, Jansen was advised by letter of September 29, 1982 that he was terminated as a butcher.
Initially, Jansen filed a complaint with the Division of Civil Rights, Department of Law & Public Safety. He also filed a union grievance. Both of these actions were withdrawn at the time the complaint was filed in the Chancery Division. After a trial, which was protracted by reason of the unavailability of experts, the trial judge concluded that the decision to terminate Jansen from his job was reasonably arrived at and, by inference, that Jansen's handicap "reasonably precluded the performance of" his "employment" as a meat cutter, within the exception provided in N.J.S.A. 10:5-4.1. The trial judge also referred to N.J.S.A. 10:5-2.1 which, in pertinent part, provides:
Nothing contained in this act ... shall be construed ... to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment....
The trial judge found that Jansen refused an offer by Food Circus to rehire him in a position other than as meat cutter. On this appeal, Jansen disputes the credibility of the evidence upon which that finding was based since it was developed on surrebuttal. The trial judge also found the proofs uncontroverted that Food Circus has an affirmative policy aimed at hiring disabled persons, and that it works with community-based organizations to hire the retarded and emotionally disadvantaged. Food Circus had received an award for the employment and training of the handicapped and had two epileptics in its employ, one a bakery clerk and the other a grocery clerk. Before being hired, both of these employees had been evaluated by Dr. Whalen, who recommended that they be hired. One of these employees experienced a seizure at work, but after reevaluation by Dr. Whalen was continued in the employ of Food Circus.
On this appeal, plaintiff raises the following arguments:

*56 POINT I
PLAINTIFF DANIEL JANSEN WAS TERMINATED SOLELY BECAUSE OF HIS EPILEPSY CONDITION, IN VIOLATION OF THE LAW AGAINST DISCRIMINATION WITHOUT CONSIDERATION OF SUPPORTABLE AND REPUTABLE SCIENTIFIC EVIDENCE CONCERNING WHETHER THE NATURE AND EXTENT OF PLAINTIFF'S HANDICAP REASONABLY PRECLUDED THE CONTINUED PERFORMANCE OF HIS DUTIES AS A MEAT CUTTER.
POINT II
ANY CLAIM THAT A HANDICAPPED INDIVIDUAL POSES A SAFETY HAZARD TO HIM OR HERSELF OR OTHERS MUST BE DOCUMENTED BY SUBSTANTIAL MEDICAL EVIDENCE ESTABLISHING TO A REASONABLE DEGREE OF MEDICAL CERTAINTY, BASED UPON THE INDIVIDUAL'S CAPABILITIES AND THE SENSORY, MENTAL AND PHYSICAL QUALIFICATIONS AND PERFORMANCE, THAT THE HAZARD WAS SERIOUS AND IMMINENT.
POINT III
THE TRIAL COURT ERRED IN ITS RELIANCE ON THE FEARS AND PREFERENCES OF DANIEL JANSEN'S CO-WORKERS AS A FACTOR IN DECIDING THAT DEFENDANT ACTED REASONABLY IN TERMINATING DANIEL JANSEN'S EMPLOYMENT.
POINT IV
THE TRIAL COURT ERRED IN CONCLUDING THAT THE ISSUE OF THE DEFENDANT'S OBLIGATIONS TO HAVE MADE REASONABLE ACCOMMODATIONS TO MAINTAIN THE CONTINUED EMPLOYMENT OF DANIEL JANSEN WAS NOT ONE OF THE LEGAL ISSUES PRESENTED FOR THE COURT'S CONSIDERATION.
POINT V
THE APPROPRIATE REMEDY IN THE INSTANT MATTER IS AN ORDER OF REINSTATEMENT RETROACTIVE TO JULY 23, 1982 WHICH WOULD FURTHER PROVIDE FOR THE PAYMENT OF ALL COMPENSATORY DAMAGES, INCLUDING BACK PAY RETROACTIVE TO JULY 23, 1982, DAMAGES FOR PAIN, SUFFERING AND HUMILIATION, AND COUNSEL FEES AND COSTS PURSUANT TO N.J.S.A. 10:5-27-1.
After having thoroughly examined the evidence in light of the applicable law, we affirm the decision of the trial judge but disagree with some of his legal conclusions. We agree with the trial judge that Jansen was not discharged by Food Circus merely because he has epilepsy. He was employed by Food Circus for eight years, notwithstanding its awareness that he had epilepsy. His employment was terminated specifically upon the medical opinions of two independent physicians that Jansen would probably have further seizures and that working *57 with knives, saws and other such implements would be dangerous to Jansen and to others.
To the extent that the trial judge's written opinion can be read to suggest that generalized but unfounded fears of fellow employees, or the potential for labor problems with the union, would "reasonably preclude" Jansen from the performance of his employment, we disagree. We recognize that the combination of the seizure, followed by Jansen's visit to Snel's home in which he displayed his anger,[3] the perceived threat that he would "take six people with him" and the dissemination by a coemployee of a definition of a psychomotor seizure, as including a possibility of homicidal tendencies, would all tend to instill fear in some employees. However, unreasonable and unfounded fears of coemployees is not an exception to an employer's obligation not to discriminate against a handicapped person. This was discussed in terms of a "perceived disability" in Andersen v. Exxon Co., 89 N.J. 483, 495-496 n. 2 (1982). Regulations adopted by the attorney general pursuant to N.J.S.A. 10:5-8g subsequent to the events in this case, specifically provide: "A refusal to select a handicapped individual because of the preferences of co-workers, clients, customers or the employer" shall not be an exception to an employer's duty not to discriminate in the employment of handicapped persons. See N.J.A.C. 13:13-2.8(a)3i. However, we read the trial judge's reference to the fears of co-workers as referring to the potential harm to others, as well as to Jansen, from a subsequent seizure "while in the act of cutting or hacking or operating a handsaw" and not as referring simply to unreasonable and unfounded fears of coemployees.
N.J.S.A. 10:5-4.1 reads as follows:

*58 All of the provisions of the act to which this act is a supplement shall be construed to prohibit any unlawful discrimination against any person because such person is or has been at any time handicapped or any unlawful employment practice against such person unless the nature and extent of the handicap reasonably precludes the performance of the particular employment.
As noted, the Legislature has provided a general construction of the law against discrimination which includes the following relevant language:
Nothing contained in this act ... shall be construed ... to prevent the termination or change of the employment of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment.... [N.J.S.A. 10:5-2.1]
The language of these statutes was construed by us in Panettieri v. C.V. Hill Refrigeration, 159 N.J. Super. 472, 483 (App. Div. 1978), in which we said:
Both provisions, read together, therefore present an employer with the opportunity of showing that conduct, which would otherwise be viewed as discriminatory, should not be so viewed because in its reasonably derived opinion the nature or the extent of the job applicant's handicap precludes performance of the job.
More recently, the Supreme Court concluded in Andersen v. Exxon, supra, 89 N.J. at 496:
There should be no second-guessing the employer. The employer has the legal liberty to reject an applicant as long as it has reasonably arrived at its opinion that the applicant is unqualified for the job.
Thus, the question presented is whether the decision by Food Circus to terminate Jansen was "reasonably arrived at" as required by N.J.S.A. 10:5-2.1, and whether the nature and extent of Jansen's handicap "reasonably precludes" the performance of the duties of a meat cutter. Jansen argues that the trial judge applied an incorrect standard, i.e., that it is "possible" that he will suffer another seizure while at work. He argues that the true test should be whether there is medical evidence which establishes to a reasonable degree of medical certainty that he will suffer another seizure, thereby making it unsafe for himself and others to allow him to continue as a meat cutter. Janse relies upon our language in Panettieri v. C.V. Hill Refrigeration, 159 N.J. at 492, that "a materially enhanced risk of injury or death is a consideration in determining whether an employee's handicap `reasonably precludes the *59 performance of the particular employment,' or under N.J.S.A. 10:5-2.1, that in the employer's opinion, `reasonably arrived at' the employee is `unable to perform adequately his duties.'"
In Panettieri, we concluded that the statutes cannot be intended to force an employer into aiding a handicapped employee to further injure himself or to aggravate the intensity of the handicap from which he suffers, accompanied by an obligation to make workers' compensation payments when such a result occurs. We further agreed that such an interpretation would compromise the best interests of both workers and employers and make no sense. Id. at 492.
We agree with Jansen that Panettieri interprets the standards contained in the statutes, "reasonably precludes" [N.J.S.A. 10:5-4.1] and "reasonably arrived at" [N.J.S.A. 10:5-2.1], to require a showing of a "materially enhanced risk of injury." The administrative regulations of the Division on Civil Rights[4] have adopted this interpretation in describing the exception to otherwise unlawful conduct:

N.J.A.C. 13:13-2.8 EXCEPTION
(a) It shall be lawful to take any action otherwise prohibited under this section where it can reasonably be determined that an applicant or employee, as a result of a handicap, cannot presently perform the job even with reasonable accommodation.
* * * * * * * *
2. Refusal to select a handicapped individual may be lawful where it can be demonstrated that the employment of the handicapped person in a particular position would presently be hazardous to the safety or health of such individual, other employees, clients or customers. Such a decision must be based upon an objective standard supported by factual or scientifically validated evidence, rather than on the basis of general assumptions that a particular handicap would create a hazard to the safety or health of such individual, other employees, clients or customers. A `hazard' to the handicapped person is a materially enhanced risk of serious harm. [Emphasis supplied.]
*60 The regulations cast the burden of proof upon the employer to demonstrate that the exception relied upon is based upon an objective standard supported by factual evidence. N.J.A.C. 13:13-2.8(a)3. Under the circumstances in this case, the burden was upon Food Circus to go forward with proofs to rebut a presumption of undue discrimination by articulating some legitimate, non-discriminatory reason for Jansen's termination. However, we note that the ultimate burden of persuading the trier of fact that Food Circus intentionally discriminated against him remained upon Jansen; only the burden of going forward shifted. See Andersen v. Exxon, supra, 89 N.J. at 493.
We acknowledge that some of the language used by the trial judge might be interpreted to express approval of a determination by an employer to terminate one who has had a psychomotor seizure from a job as meat cutter on the "possibility" that he may suffer another such seizure, with a further "possibility" of injury to himself or others. We agree with Jansen that such a determination would be inadequate to meet the standard of the statute as interpreted by us in Panettieri and implemented in the administrative regulations. However, our review of the evidence does not indicate that the judge applied a "possibility" standard. Although the medical witnesses disagreed as to whether Jansen should be continued in his employment as a meat cutter, one of defendant's experts, Dr. Masland, a preeminent neurologist, stated in a letter dated November 21, 1983 and quoted by the trial judge, "The question of whether this man is employable is a matter of a value judgment. No one can guarantee completely that he will not have another seizure while at work." The doctor then proceeded to suggest that the possibility of another seizure at work was unlikely. The trial judge found as a fact that Jansen had not had another psychomotor seizure since July 17, 1982 until the date of his determination. However, after reciting the conflicting opinions of the doctors, the trial judge concluded *61 "the doctors, in a word, disagreed not on the diagnosis but on the future probabilities." [Emphasis supplied.]
We are satisfied that to the extent it was necessary for the trial judge to conclude that a further seizure was reasonably probable, as opposed to merely possible, he did reach that determination based upon the medical evidence presented. For example, Dr. Whalen, upon whose opinion the trial judge relied, testified:
In fact, the probabilities are in view of his history, to date, the probabilities are at some future point whether it is next week, next month, or next year that the probabilities are that he will have another seizure.
More to the point, however, is to determine whether the decision by Food Circus, in reliance upon the medical opinions received, was reasonably arrived at, and whether Jansen was reasonably precluded from the performance of the duties of a meat cutter. It is evident in this case that Dr. Whalen conducted a thorough examination before reaching his evaluation and had the benefit of the evaluation of a psychiatrist. This is quite different than the totally inadequate examination by the doctor in Andersen v. Exxon, supra. Furthermore, Dr. Whalen was an independent physician, and although making the examination for Food Circus, was not the "company" doctor even though he had examined other employees on behalf of the company. Dr. Whalen has examined other employees with epilepsy and has reached an opposite conclusion. We are satisfied that the decision by Food Circus in reliance upon the determination by Dr. Whalen and that it was reasonably probable that Jansen would suffer another psychomotor seizure, was reasonably arrived at, and this circumstance reasonably precludes Jansen from the position as a meat cutter.
There is nothing to indicate that Food Circus decided that all persons with epilepsy are automatically precluded from the job as meat cutter.[5] This is belied by the fact that Food Circus, *62 with knowledge that Jansen had epilepsy, continued him in his employment as a meat cutter for eight years.
We see no need to address Jansen's contention that the trial judge refused to permit evidence directed to his argument that Food Circus did not make "reasonable accommodations" to his epilepsy. There was sufficient evidence presented, albeit on surrebuttal, in support of the trial judge's finding that Jansen rejected the offer of Food Circus for employment other than as a meat cutter. See Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974).
Affirmed.
NOTES
[1] In his written opinion, the trial judge quoted from a report of Dr. Richard S. Rhee, dated August 22, 1978, describing his examination of Jansen on August 21, 1978 when Jansen was hospitalized "for work-ups for possible temporal lobe mass lesion." In the course of recounting Jansen's description of the "funny episodes" which occurred, Dr. Rhee said that Jansen's last attack was two and one-half months ago when "he felt so strange that he stopped cutting the meat in order to avoid injury." It does not appear whether he was "cutting the meat" at work or at some other place, but this occurred in early June 1978, while Jansen was employed by Food Circus.

Jansen was also hospitalized in 1980. In a letter to a referring physician, dated October 21, 1980, Dr. Paul J. Silbert, one of Jansen's witnesses at the trial, said: "... he has been gainfully employed as a butcher and doing well until 9/3/80 when he suffered a generalized seizure as observed by his friend while the two of them were riding in a car. His friend noted a loud yell, frothing at the mouth, generalized tonic clonic movements, all of which the patient has memory for. He was subsequently hospitalized."
[2] The finding by the trial judge that Jansen's pay continued was in error.
[3] Dr. Whalen testified: "... in this particular kind of seizure disorder that is psychomotor or temporal lobe disorder, that the incident of this particular kind of psychiatric change which generally consists of tendency to hostility and belligerence and sometimes even to paranoia, that the incident of that are significantly higher in psychomotor states than it is in the other classes of seizure disorder."
[4] Although adopted subsequent to the events in this case, we refer to the regulations as reenforcement for our conclusion.
[5] At trial analogies were made to the fact that people with epilepsy may be licensed to drive motor vehicles. See N.J.S.A. 39:3-10 et seq. We note, however, that such person must have been free from seizures for a period of one year, see N.J.A.C. 13:19-5.1, unless the review committee recommends less. See N.J.A.C. 13:19-5.7. Periodic reports as to the individual's case history, including a statement by the treating physician, must be submitted every six months for a period of two years from the date that approval is given to hold a driver's license and yearly thereafter. See N.J.A.C. 13:19-5.9.